1
2
3
4
5                    IN THE UNITED STATES DISTRICT COURT
6                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8    JOSEPH GLASS, et al.,                    No. C-06-4068 MMC
9              Plaintiffs,                    **ORDER (1) GRANTING JOINT MOTION
                                              FOR FINAL APPROVAL OF
10                                            SETTLEMENT; (2) GRANTING CLASS
      v.                                      COUNSEL'S APPLICATION FOR
11                                            ATTORNEY'S FEES, COSTS AND
                                              CLASS REPRESENTATIVE
12   UBS FINANCIAL SERVICES, INC., et al.,    ENHANCEMENTS**
13             Defendants.                    (Docket Nos. 183, 185)
                                        /
14

15        Before the Court are two motions filed January 5, 2007: (1) the parties' joint motion

16   for final approval of settlement; and (2) class counsel's application for attorney's fees,

17   costs, and class representative enhancements.  On January 19, 2006, the Court held a

18   fairness hearing.  Having considered the papers filed in support of the motions, and the

19   arguments of counsel for the parties and for objector Marty Evans at the fairness hearing,

20   the Court rules as follows.

21                              **BACKGROUND**

22        The instant class action is asserted on behalf of a class consisting of all persons

23   who, at any time during the applicable statute of limitations, are or were employed as

24   stockbrokers at any of the brokerage offices of UBS Financial Services Inc. or its

25   predecessors, UBS Paine Webber and Paine Webber Group Inc., anywhere in the United

26   States or its territories, excluding California.  (See Compl. ¶ 1.)  Plaintiffs Joseph Glass,

27   Dante DiFrancesco, Ralph Carbone, and David Bachrach allege that they worked as

28   stockbrokers for defendant UBS Financial Services, Inc. and/or its predecessors UBS

     Paine Webber and Paine Webber Group, Inc.  (See id.  ¶¶ 7-10.)  The first four causes of

1   action are for failure to pay overtime wages in violation of the federal Fair Labor Standards

2   Act, and New Jersey, New York, and Connecticut law.[1]  (See id. ¶¶ 27-55.)  The fifth, sixth,

3   and seventh causes of action are for improper deductions from wages in violation of New

4   Jersey, New York, and Connecticut Law.  (See id. ¶¶ 56-70.)

5        The action was settled on January 31, 2006 during a mediation conducted by David

6   Rotman, who, defense counsel attests, is "one of the preeminent mediators of employment

7   law claims in the country."  (See Wilcox Decl. ¶ 3.)  On July 28, 2006, the parties filed a

8   joint motion for preliminary approval of the proposed settlement.  The amended joint

9   stipulation of settlement provides for a maximum payment of $45,000,000 to a class

10   consisting of "all persons who work or worked for UBS in the Covered Positions during the

11   Covered Period in the United States including United States territories, and excluding the

12   state of California."  (See Amended Joint Stipulation of Settlement ¶¶ 5, 29(a).)  "UBS" is

13   defined to include "UBS Financial Services, Inc. and all of its officers, directors, agents,

14   attorneys, parents, predecessors (including UBS Paine Webber and Paine Webber Group

15   Inc.), successors, subsidiaries, and related and affiliated entities, including UBS

16   International, Inc."  (See id. ¶ 2.)  The "covered positions" are defined as "job codes 226

17   and 008226, Unregistered Trainee; job codes 456 and 008456, Broker; and job codes 457

18   and 008457, Registered Trainee at UBS."  (See id. ¶ 14.)  The "covered period" varies

19   depending on "the applicable statute of limitations period for the jurisdiction in which the

20   Class Member was employed."  (See id. ¶ 13 and Ex. E.)

21        The proposed settlement further provides that of the $45,000,000 settlement

22   amount, the following amounts will be deducted, subject to court approval: (1) attorney's

23   fees and litigation costs in an amount up to $11,250,000; (2) "enhancements" to the four

24   named class representatives, in an amount up to $100,000 ($25,000 each); and (3) a

25   "reasonable amount" to the Claims Administrator to administer the settlement.  (See id.

26   _____

27        [1] Glass and Bachrach allege they worked for defendants in New Jersey.  (See
    Compl. ¶¶ 7, 10.)  DiFrancesco alleges he worked for defendants in New York.  (See id.
28   ¶ 8.)  Carbone alleges he worked for defendants in Connecticut.  (See id. at 9.)

¶ 29(a).)  The settlement provides that all unclaimed funds will revert to UBS, as well as any portion of the maximum $11,500,000 in attorney's fees and $100,000 in enhancements that is not awarded by the Court.  (See id. ¶¶ 29(b), 30-31.)

Each class member who participates in the settlement will receive a fixed payment from the settlement fund based on the number of months or partial months he or she worked in a covered position for the period between the commencement of the applicable statute of limitations for the state or territory in which that class member worked for UBS and the date of preliminary approval.  (See id. ¶ 32(c).)  The Class Notice provides that class members who worked in New York, New Jersey, or Pennsylvania will receive $120.00 for each full or partial month worked during the class period, while class members who worked in other states will receive $75.00 for each full or partial month worked during the class period.[2]  (See Class Notice at 3 ¶ C.)

On August 25, 2006, the Court granted preliminary approval of the settlement and set a fairness hearing for January 19, 2007.  Pursuant to the Class Notice, any objections to the settlement were required to be mailed on or before November 14, 2006.  (See Class Notice at 7 ¶ C.)

The Court received objections to the settlement from the following class members: (1) Clinton E. Anderson ("Anderson"), dated September 20, 2006; (2) Norman Demetrios Pappous ("Pappous"), dated September 20, 2006; (3) Steven D. Arkwright ("Arkwright"), dated September 21, 2006; (4) Jason Cintron ("Cintron"), dated September 26, 2006; (5) Geoffrey Earl Wilwerding ("Wilwerding"), dated October 18, 2006; (6) Christopher C. Gabriel ("Gabriel"), dated November 7, 2006; (7) Marty Evans ("Evans"), dated November 14, 2006; and (8) Shrenik Bavishi ("Bavishi"), dated November 14, 2006.  Evans also filed supplemental objections, dated December 21, 2006, relating to the Court's appointment of

---

[2] According to the settlement, "The formula developed by the parties allocates a greater proportion of the settlement funds to class members in New York, New Jersey, and Pennsylvania than to class members in other jurisdictions because the law and litigation activity regarding wage deductions in other jurisdictions likely would have caused the parties to devote disproportionate resources to the litigation with uncertain results."  (See id. ¶ 29(b).)

1   a special master.  In addition, the Court, on January 8, 2007, granted the motion of the

2   Attorney General of the State of New York ("New York Attorney General") to appear as

3   amicus curiae, and the New York Attorney General has filed an amicus brief raising its

4   concerns about the settlement.

5       Additionally, class member Lawrence R. Kaufmann ("Kaufmann") filed a motion to

6   intervene, which motion contained objections to the settlement.  Kaufmann subsequently

7   withdrew the motion.  By orders filed November 16, 2006 and January 17, 2007, the Court

8   permitted Kaufmann to withdraw, respectively, both his motion to intervene and his

9   objections to the proposed settlement.  After Kaufmann withdrew his motion to intervene,

10  class member Anthony D'Aria filed a motion to adopt Kaufmann's objections and a motion

11  to intervene in the action.  By orders filed November 16, 2006 and January 17, 2007,

12  respectively, the Court denied D'Aria's motions.

13      On December 7, 2006, pursuant to the joint motion of the parties, the Court

14  appointed the Honorable Charles A. Legge (hereafter "Judge Legge") as a special master,

15  pursuant to Rule 53 of the Federal Rules of Civil Procedure, "to review issues or questions .

16  . . relative to the allocation among different states of the settlement proceeds" and to

17  "determine whether the allocation formula in the settlement is fair, reasonable and

18  adequate in light of any timely challenges to that allocation."  (See Order Appointing the

19  Honorable Charles Legge as Master Pursuant to the Stipulation of the Parties ("Stipulated

20  Appointment Order"), filed Dec. 7, 2006, at 2-3.)  Pursuant to such authority, Judge Legge

21  held a hearing on the matter on January 4, 2007, and, on January 12, 2007, filed a "Report,

22  Findings and Recommendations of the Master."

23                          **LEGAL STANDARD**

24      The Court may approve a class action settlement "only after a hearing and on finding

25  that the settlement . . . is fair, reasonable, and adequate."  See Fed. R. Civ. P. 23(e)(1)(C).

26  "Assessing a settlement proposal requires the district court to balance a number of factors:

27  the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of

28  further litigation; the risk of maintaining class action status throughout the trial; the amount

4

offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).

"It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." Id. "The settlement must stand or fall in its entirety." Id. The Court may not delete, modify, or rewrite particular provisions of the settlement. See id. "Settlement is the offspring of compromise; the question . . . is not whether the final product could be prettier, smarter, or snazzier, but whether it is fair, adequate, and free from collusion." See id.

**DISCUSSION**

**A.  Joint Motion for Final Approval**

**1.  Strength of case**

The Court is aware of no controlling federal or state authority on the issue of whether stockbrokers are entitled to overtime pay.  As set forth below, the legal uncertainty at the time of settlement with respect to whether stockbrokers are entitled to overtime under federal and state law thus favors settlement of the instant action.

The FLSA contains various exemptions from its requirement that employers pay their employees time and a half for work in excess of 40 hours per week, including, in particular, an exemption for "any employee employed in a bona fide . . . administrative . . . capacity." See In re Farmers Insurance Exchange, 466 F.3d 853, 858-59 (9th Cir. 2006); see also 29 U.S.C. § 213(a)(1).  After the instant settlement was negotiated, one federal district court held the question of whether the stockbroker plaintiffs therein had performed work qualifying for such "administrative exemption" presented a triable issue of material fact that precluded summary judgment.  See Takacs v. A.G. Edwards and Sons, Inc., 444 F. Supp. 2d 1100, 1110-13 (S.D. Cal. 2006).  Thereafter, on November 27, 2006, the Department of Labor issued an Opinion Letter stating that stockbrokers, to the extent they perform certain duties, meet the requirements of the administrative exemption and, thus,

are not entitled to overtime under the FLSA.  (See Wilcox Decl. Ex. I at 8.)  Although not

binding authority, courts "must give deference to the DOL's interpretation of its own

regulations through, for example, Opinion Letters."  See Farmers, 466 F.3d at 860.  No

court to date has determined the appropriate amount of deference to be afforded the

November 27, 2006 Opinion Letter.  As the parties note, "[t]he bottom line is that the law in

this area is sparse and the outcome of any litigation was far from clear, for either UBS or

the Plaintiffs."

Accordingly, this factor supports approval of the settlement.

### 2.     The risk, expense, complexity, and likely duration of further litigation

In light of the above-referenced uncertainty in the law, the risk, expense, complexity,

and likely duration of further litigation likewise favors the settlement.  Regardless of how

this Court might have ruled on the merits of the legal issues, the losing party likely would

have appealed, and the parties would have faced the expense and uncertainty of litigating

an appeal.   "The expense and possible duration of the litigation should be considered in

evaluating the reasonableness of [a] settlement."  See In re Mego Financial Corp.

Securities Litigation, 213 F.3d 454, 458 (9th Cir. 2000).  Here, the risk of further litigation is

substantial.

Accordingly, this factor supports approval of the settlement.

### 3. The risk of maintaining class action status throughout the trial

As the parties observe, the proposed settlement "accords every Covered Employee

in every state the right to participate in the claim procedure without regard to factual and

legal idiosyncrasies in their claims."   (See Motion at 9:4-5.)  Because the instant class

covers employees who worked in every state other than California, the Court agrees with

the parties that "[g]iven the diverse law that surrounds overtime eligibility and wage

deductions across the country," it was by no means certain that plaintiffs would have been

able to obtain certification of "the wall-to-wall class that UBS is willing to accept for

settlement purposes."  (See Motion at 9:5-8.)

Accordingly, this factor supports approval of the settlement.

### 4. The amount offered in settlement

In determining whether the amount offered in settlement is fair, the Ninth Circuit has suggested that the Court compare the settlement amount to the parties' "estimates of the maximum amount of damages recoverable in a successful litigation." See In re Mego Financial Corp. Securities Litigation, 213 F.3d at 459. "[A] cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair," however. See id.

Here, the parties represented to the Court at the preliminary approval hearing that the amount of the settlement constituted approximately 25 to 35% of the amount of damages plaintiffs could have hoped to prove at trial. (See New York Attorney General Decl. Ex. 1 (Transcript of Aug. 11, 2006 preliminary approval hearing) at 13:1-14:5.) The parties provided support for that calculation at the January 19, 2007 final fairness hearing. The Court finds a settlement based on such percentage reasonable in light of the uncertainties involved in the litigation.

Accordingly, this factor supports approval of the settlement.

### 5. The extent of discovery completed and the stage of the proceedings

Here, no formal discovery took place prior to settlement. As the Ninth Circuit has observed, however, "[i]n the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." See In re Mego Financial Corp. Securities Litigation, 213 F.3d at 459. In that regard, plaintiffs state that prior to mediation, plaintiffs' counsel "receiv[ed] informal discovery relating to the types and amounts of deductions taken by UBS, the months worked, and the salaries of UBS financial advisors," as well as "the benefit of information and documents given to [counsel] by [ ] many current and former UBS brokers." (See McInerney Decl. ¶ 13.) In addition, plaintiffs' counsel attests, he "deposed a consultant for UBS regarding the methodology of gathering the data that was provided at the mediation" and "received absolutely no indication that any of the material

1    provided by UBS was incorrect."  (See id. ¶ 16.)

2            Accordingly, this factor supports approval of the settlement.

3                      **6.  The experience and views of counsel**

4            The settlement was negotiated and approved by experienced counsel on both sides

5    of the litigation, with the assistance of a well-respected mediator with substantial

6    experience in employment litigation.  Accordingly, this factor supports approval of the

7    settlement.

8                      **7.  The presence of a governmental participant**

9            One of the factors the Court may consider in evaluating the fairness of a settlement

10   is "the presence of a governmental participant."  See Hanlon v. Chrysler Corp., 150 F.3d at

11   1026.  The participation of a governmental entity "serves to protect the interest of the class

12   members."  See Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1178 (9th Cir. 1977).

13   There is no indication that any governmental entity participated in the settlement of the

14   instant action.

15           Accordingly, this factor favors neither approval nor disapproval of the settlement.

16                     **8.  The reaction of the class members to the proposed settlement**

17           On September 15, 2006, notice of the settlement was mailed to 13,176 class

18   members.  (See Holland Decl. ¶ 6.)  As of January 4, 2007, the parties had received 6684

19   claim forms, representing approximately 51% of the total class members.  (See id. ¶ 11.)

20   The claim forms submitted seek compensation for a total of 241,609 qualified full or partial

21   months worked during the class period, representing approximately 63% of a total of

22   386,271 qualified full or partial months worked by the class during the class period.  (See

23   id. 11.)  The claims submitted seek payment of approximately $21,133,928 from the

24   settlement fund.  (See id.)

25           As of January 4, 2007, class members had submitted 280 requests to opt out of the

26   settlement, representing an opt-out rate of approximately two percent.  (See id. ¶¶ 16-18.)

27   As noted above, timely objections to the settlement were submitted by eight class members

28   and, as amicus, the New York Attorney General.

**a.  Objections by New York Attorney General**

The objections of the New York Attorney General fall into three general categories. First, the New York Attorney General contends the settlement is unfair to New York class members because the recovery for each New York class member is less than the amount each California class member received in the settlement of the related action, Bowman v. UBS, C-04-3525.  Second, the New York Attorney General objects to the requested attorney's fee award as excessive.  Third, the New York Attorney General contends that the attorney's fee award provision of the settlement is contrary to Ninth Circuit authority as set forth in Staton v. Boeing, 327 F.3d 938 (9th Cir. 2003) and, as such, requires rejection of the settlement.  The Court will address the New York Attorney General's substantive objections below, and will address its objections to the amount of fees sought in connection with class counsel's application for attorneys' fees.

**i.  Comparison to Bowman Settlement**

The Bowman action, although addressing issues similar to those raised by the instant action, was an entirely separate and distinct case.  In Bowman, a class of California stockbrokers, represented by different counsel than those representing the Glass plaintiffs, asserted claims under the FLSA and California law for unpaid overtime and improper wage deductions.  Bowman was settled before any of the three cases ultimately consolidated as the Glass action was filed.

Because Bowman and Glass are separate actions that were separately litigated and separately settled, any direct comparison of the Bowman and Glass settlements is unwarranted.  Indeed, even if the two actions were otherwise indistinguishable, a settlement for a lesser amount nonetheless may constitute a fair, reasonable, and adequate compromise of the dispute.  Settlements by their very nature are not intended to provide full compensation for the claimed losses and consequently cannot be calculated with the same precision as actual damages.  See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 119 (2d Cir. 2005) (noting existence of "range of reasonableness" with respect to any settlement).

9

1    Moreover, defendants have submitted a response to the New York Attorney

2    General's amicus brief, setting forth in detail the reasons for their belief that their defenses

3    to plaintiffs' claims are stronger under New York law than under California law and,

4    accordingly, why defendants were willing to settle the California claims for a higher amount

5    per class member.  In response, the New York Attorney General now concedes there is a

6    "major difference" between New York and California overtime laws and, in particular, that "it

7    is significantly easier to meet the FLSA (and New York) administrative exemption, greatly

8    increasing the risk that New York as compared with California brokers would be found

9    exempt from overtime law."  (See New York Attorney General's Reply at 3:1-4.)

10   Additionally, the New York Attorney General now acknowledges that "longer working hours

11   in California . . . might explain a portion of the greater monetary recovery available in the

12   Bowman settlement."  (See id. at 4:12-13.)  Although the New York Attorney General

13   continues to take issue with defendants' arguments that California law on the wage

14   deduction claims and availability of penalties is more favorable to plaintiffs than New York

15   law, the Court finds the undisputed differences between California law and New York law

16   with respect to the overtime claims suffices to justify the differences between the Bowman

17   and Glass settlements.

18       Accordingly, the Court finds the differences between the Bowman and Glass

19   settlements do not warrant rejection of the instant settlement.

20                              **ii.  Attorney's Fees**

21       As noted above, the New York Attorney General's objections to the amount of

22   attorney's fees sought will be addressed below in connection with class counsel's motion

23   for attorneys' fees.

24                              **iii.  Staton v. Boeing**

25       The New York Attorney General argues that the Ninth Circuit's opinion in Staton v.

26   Boeing requires rejection of the proposed settlement.  In particular, the New York Attorney

27   General reads that decision to hold a settlement that provides for class counsel's seeking a

28   specified percentage of a common fund, with a reversion to the defendant of any portion of

1   the requested amount not granted by the court, "'allows too much leeway for lawyers

2   representing a class to spurn a fair, adequate and reasonable settlement for their client in

3   favor of inflated attorney's fees.'"  (See Amicus Brief at 17:11-15 (quoting Staton, 327 F.3d

4   at 969-70).

5          The language from Staton on which the New York Attorney General relies does not

6   stand for the broad proposition asserted by the New York Attorney General.  In Staton, the

7   settlement therein at issue provided for an award of a fixed amount of attorneys' fees,

8   which fees were not subject to court review.  See Staton, 327 F.3d at 944-45; see also id.

9   at 969 ("The parties negotiated the amount of attorneys' fees awarded as a term of the

10  settlement agreement and thus conditioned the merits settlement upon judicial approval of

11  the agreed-upon fees.").  The Ninth Circuit found the lack of any provision for judicial review

12  of the fees created a risk that class counsel would "spurn a fair, adequate and reasonable

13  settlement for their clients in favor of inflated attorneys' fees," and held that "in order to

14  obtain fees justified on a common fund basis, the class's lawyers must ordinarily petition

15  the court for an award of fees, separate from and subsequent to settlement."  See id. at

16  945.[3]  Here, by contrast, the settlement expressly provides for a determination by the Court

17  of the amount of fees to be awarded to class counsel.  (See Amended Joint Stipulation of

18  Settlement ¶ 29(a).)  Although the settlement further provides that if the Court does not

19  award the maximum amount of $11,250,000 in fees, the difference between that figure and

20  the amount actually awarded will be returned to defendants, such provision does not

21  conflict with Staton; the provision for court review of the amount of fees awarded

22  adequately addresses the Ninth Circuit's concern that class counsel might negotiate "an

23  excessive fee at the expense of the class."  See id. at 972.

24         Accordingly, the Court finds Staton does not warrant rejection of the settlement.

25  _____

26         [3] Although, as the New York Attorney General correctly notes, the Ninth Circuit
    described with approval a procedure by which the parties would agree to the amount of a
    common fund and provide for court determination of the amount of fees to be awarded from
27  the fund, with distribution of the remainder "to the class rather than reverting to the
    defendant," see id. at 972, the Ninth Circuit stressed that such procedure was but one
28  permissible alternative and that it did "not mean to preclude all others," see id. at 972 n.22.

**b.  Objections of Anderson, Arkwright, Wilwerding, and Gabriel**

Class members Anderson, Arkwright, Wilwerding, and Gabriel do not object to any particular provision of the settlement.  Rather, each objects to the filing of the <u>Glass</u> action in the first instance.  In particular, Anderson states that he is "offended" by "Financial Advisers who sue to 'recover' overtime and business expenses when they knew full well how [the] industry's compensation structure works"; he further states he wishes to "register [his] disgust at this lawsuit and settlement."  (<u>See</u> Anderson Objection at 2.)  Likewise, Arkwright expresses the opinion that the instant action "is shameful and disturbing" and contends that "[t]he people involved in bringing this action should try to work, earn an honest living and do the right thing instead of sucking of[f] others like a leach."  (<u>See</u> Arkwright Objection at 1 (emphasis deleted).)  Wilwerding states that he "object[s] to the entire settlement" because the plaintiffs "were never promised any compensation for overtime when they hired on"; he further offers his opinion that the instant action "is a pure opportunistic case which [in] the end result does no more than hurt the investors whom we serve."[4]  (<u>See</u> Wilwerding Objection at 1-2.)  Gabriel states that the suggestion that "UBS somehow has mistreated [him] is an affront to both [his] own positive experiences and to the closely-guarded reputation of th[e] firm" and expresses the opinion that "all of the time and money wasted by this sorry lawsuit could have been deployed productively elsewhere by UBS and all involved."  (<u>See</u> Gabriel Objection at 1-2.)

As each of the above-referenced objections challenges the filing of the lawsuit, and not the fairness of either the settlement as a whole or any particular provision thereof, such objections do not support rejection of the settlement.  Anderson, Arkwright, Wilwerding, and Gabriel were free to opt out if they did not wish to participate in the instant litigation, and Wilwerding in fact did so.

**c.  Objections of Pappous**

Pappous objects to the allocation of settlement proceeds.  In particular, Pappous

---

[4] Wilwerding also expressly opted out of the instant action.  (<u>See</u> Wilwerding Objection at 4.)

1   argues that "the cost of [his] labor was just as much in Virginia as it was in New Jersey,

2   Pennsylvania, or New York" and that there "is no justifiable methodology which allocates

3   60% more ($75 vs. $120) to the individuals who worked in" New Jersey, Pennsylvania and

4   New York.  (See Pappous Decl. at 1.)

5          The parties, however, do not purport to compensate class members from New

6   Jersey, Pennsylvania, and New York at a higher rate because Financial Advisers in those

7   states have higher salaries, but rather because their legal claims are more valuable in

8   those states than the claims of class members in other jurisdictions.

9          Accordingly, Pappous's objection does not warrant rejection of the settlement.

10                        **d.  Objections of Cintron**

11          Cintron asserts two objections to the proposed settlement.  At the outset, Cintron

12   argues that the settlement fails to compensate him for the actual amount of overtime he

13   worked.  Cintron misunderstands the purpose of the settlement, which is not to provide full

14   compensation for all overtime hours each class member worked, but to compensate class

15   members for the value of their legal claims to overtime pay.  As the parties point out, the

16   recent Opinion Letter from the Department of Labor provides support for UBS's contention

17   that class members' are unlikely to be able to prove their entitlement to any overtime pay

18   under the FLSA.  The Court finds this objection does not warrant rejection of the

19   settlement.  Additionally, Cintron objects to the amount of attorneys' fees sought by

20   plaintiffs' counsel.  The Court will address such objection below in connection with class

21   counsel's motion for attorney's fees.

22                        **e.  Objections of Bavishi**

23          Although Bavishi has submitted objections to the settlement, he also has opted out.

24   (See Holland Decl. ¶ 23 and Ex. A.)  Consequently, as Bavishi is no longer a class

25   member, he has no standing to object.[5]  See Fed. R. Civ. P. 23(e)(4)(A) (providing "any

26   _____

27          [5] On January 17, 2007, Bavishi filed a motion to opt back into the settlement.
     Because Bavishi, by such motion, seeks to assert an untimely claim, and because the
28   settlement provides that the claims administrator "will perform the duties of . . . resolving
     any disputes regarding claims by the Class Members" and will "timely notify class claimants

1    class member may object to a proposed settlement"); <u>Mayfield v. Barr</u>, 985 F.2d 1090 (D.C.

2    Cir. 1993) (holding "[t]hose who are not class members, because they are outside the

3    definition of the class or have opted out" lack standing to object to class settlement);

4    <u>Jenson v. Continental Finance Corp.</u>, 591 F.2d 477, 482 n.7 (8th Cir. 1979) ("Opt-outs . . .

5    are not members of the class and hence are not entitled to the protection of Rule 23(e).").

6            Accordingly, the Court does not consider Bavishi's objections.[6]

7                           **f.  Objections of Evans**

8            Evans has submitted numerous objections to the settlement and to the amount of

9    attorneys' fees sought by class counsel.  The Court first will address Evans's substantive

10    objections, and thereafter, in discussing class counsel's application for fees, will address

11    Evans's objections to the amount of fees.

12                           **i.  Damages Analysis**

13            Evans's first objection is that the parties have provided no analysis of the value of

14    the class's claims.  Evans contends that the parties "should be able to provide the Court

15    and class members with information on the monetary value of: (a) the class's 'unpaid

16    overtime' claims; (b) the class's 'unreimbursed business-related expenses' claims; (c) the

17    class's 'improper training error deduction' claims; and (d) the class's claims for 'interest and

18    penalties.'" (<u>See</u> Evans Objection at 4:23-5:1.)  Evans contends that without such

19    information, the Court cannot make a rational determination as to whether the amount of

20    the settlement is fair, reasonable, and adequate.

21            At the August 11, 2006 hearing on the parties' motion for preliminary approval of the

22    settlement, the Court noted that because the parties had failed to provide an estimate of

23    the actual losses claimed by the class members, the Court had no way of determining

24    _____

25    whose claims are untimely or denied for other reasons," (<u>see</u> Amended Joint Stipulation of
      Settlement ¶¶ 3, 46), Bavishi's motion is hereby DENIED without prejudice to his making

26    such request of the claims administrator.

27            [6] The Court further notes that Bavishi's objections relate to (1) issues that are not the
      subject of the class claims and (2) Bavishi's misunderstanding of class action litigation

28    procedures, and, consequently, would not require rejection of the settlement even if the
      Court were to consider such objections.

                                   14

1   whether the amount of the settlement was acceptable.  (<u>See</u> New York Attorney General

2   Decl. Ex. 1 at 11:25-12:22.)  As the parties note, they have represented to the Court that

3   the settlement constitutes approximately 25 to 35% of the estimated actual loss.  (<u>See</u> <u>id</u>. at

4   14:2-3.)  At the final fairness hearing, the parties presented a lengthy discussion of the

5   above-referenced estimate, in which they represented that their estimate of the maximum

6   loss to the class was based on hard data obtained from interviews with class members,

7   computer log-in records, and payroll records.  The Court is satisfied that the parties had a

8   reasonable factual basis for their estimate that the $45,000,000 settlement represented, at

9   a minimum, 25 to 35% of the loss to the class.

10        Accordingly, the Court finds the amount of the settlement was fair, reasonable, and

11  adequate, and that the parties' failure to provide a detailed written analysis of the value of

12  the claims does not warrant rejection of the settlement.

13                              **ii.  Legal Analysis**

14        Evans's next objection is that the parties have failed to "provide a detailed

15  assessment of each theory of liability and the evidence and the law that would support or

16  refute that theory."  (<u>See</u> Evans Objection at 6:13-15 (internal quotation and citation

17  omitted).)  To the extent the parties are required to do so, the Court finds their various

18  memoranda filed with this Court and with Judge Legge, as well as their presentation at the

19  final fairness hearing, adequately set forth a legal and factual analysis of the claims.

20                    **iii.  Adequacy of Class Representatives**

21        Evans next argues that because each of the named plaintiffs is a former employee

22  of defendants, the named plaintiffs might not be adequate representatives of a class that

23  includes both current and former UBS employees.  In particular, Evans notes that the

24  settlement contains no statement as to whether any UBS policies will be changed with

25  respect to class members who are current employees, a matter in which, as Evans

26  observes, former employees have no interest.

27        Rule 23(a)(4) provides that a class action may be maintained only if "the

28  representative parties will fairly and adequately protect the interests of the class."  <u>See</u> Fed.

1   R. Civ. P. 23(a)(4).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts

2   of interest between named parties and the class they seek to represent."  Amchem

3   Products, Inc. v. Windsor, 521 U.S. 591, 626 (1997); see also Lerwill v. Inflight Motion

4   Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978) (describing "two criteria for determining the

5   adequacy of representation"; "[f]irst, the named representatives must appear able to

6   prosecute the action vigorously through qualified counsel, and second, the representatives

7   must not have antagonistic or conflicting interests with the unnamed members of the

8   class").  As the parties observe, there is no conflict between the named plaintiffs and class

9   members who are current employees of defendants.  Both former and current employees

10  are equally interested in obtaining compensation for the assertedly unlawful practices set

11  forth in the complaint.  The fact that, in any given case, some of the class members may

12  have potential claims in addition to those raised by the named plaintiffs does not

13  necessarily create a conflict of interest between the named plaintiffs and such class

14  members.

15      Here, the purpose of the instant settlement is to provide compensation for assertedly

16  unlawful practices occurring during the class period.  Notably, the settlement provides for a

17  release only of claims "arising during the Class Members' Released Period," which ends on

18  the date of final approval of the settlement, (see Amended Joint Stipulation of Settlement

19  ¶¶ 8, 48-49), and, thus, does not preclude any class member from filing suit against UBS

20  for any future violation of the law.  Consequently, if any class member is of the view that

21  defendants' ongoing policies are unlawful, they remain free to challenge such policies in a

22  future lawsuit.[7]

23      Accordingly, the Court finds the lack of provision for changes in defendants' policies

24  does not warrant rejection of the settlement.

25

26

_____

27      [7] The Court further notes that class counsel, in both their fees motion and at the final

28  hearing, represented that defendants have agreed to implement certain policy changes.
    (See Fees Motion at 2:27-3:15.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### iv.  Allocation of Settlement Fund and Objections to Appointment of Judge Legge as Master

Evans next argues that the parties have not provided an adequate explanation for the allocation of settlement funds among the class members, in particular, the larger distribution to class members who worked in New York, New Jersey, and Pennsylvania as compared with the distribution to class members who worked in other states.

As noted, the Court, at the parties' request, appointed Judge Legge as special master, pursuant to Rule 53 of the Federal Rules of Civil Procedure, "to hear and determine whether the allocation formula in the settlement is fair, reasonable and adequate in light of any timely challenges to that allocation." (See Order Appointing the Honorable Charles Legge as Master Pursuant to the Stipulation of Parties, filed Dec. 7, 2006.)  The parties thereafter submitted extensive briefing on the matter to Judge Legge, and Evans filed a supplemental objection raising concerns about the manner in which Judge Legge was appointed as master.  (See Supplemental Objection of Plaintiff Class Member/Objector Marty Evans, filed December 21, 2006.)

On January 12, 2007, Judge Legge issued a "Report, Findings and Recommendations of the Master," in which he recommended this Court find "that the procedures for the appointment of the Master substantially complied with the requirements of Rule 53; were fair, adequate and reasonable; and that the Master has been duly appointed under Rule 53 with jurisdiction over the issue referred to him." (See Report, Findings, and Recommendations of the Master, filed January 12, 2007, at 3.)  Judge Legge further recommended that "[t]he allocation formula . . . be found to be fair, reasonable, and adequate." (See id. at 9.)

### (1) Objections to Appointment of Judge Legge

Evans stresses that his objection to the appointment of Judge Legge "relates to procedural irregularities surrounding the Order of appointment and has nothing to do with Judge Legge's qualifications to serve as special master."  In particular, Evans contends, the order appointing Judge Legge did not comply with all of the requirements of Rule 53.  In

17

1    their motion for final approval, the parties do not address Evans's objections to the order

2    appointing Judge Legge.

3           As Evans points out, an order appointing a master pursuant to Rule 53 "must state"

4    inter alia, (1) "the circumstances – if any – in which the master may communicate ex parte

5    with the court or a party"; (2) "the nature of the materials to be preserved and filed as the

6    record of the master's activities"; and (3) "the time limits, method of filing the record, other

7    procedures, and standards for reviewing the master's orders, findings, and

8    recommendations."  See Fed. R. Civ. P. 53(b)(2).  Although Evans correctly observes that

9    the proposed order submitted by the parties and signed by Court fails to expressly set forth

10   all of the above-referenced information, the Court, for the following reasons, agrees with

11   Judge Legge that the order is in substantial compliance with Rule 53(b)(2).  First, the Court

12   has not communicated ex parte with Judge Legge, nor is it aware of any ex parte

13   communications between Judge Legge and any party.  Moreover, the Court is confident

14   that Judge Legge, as a former federal judge, is well aware of the need to avoid ex parte

15   communications absent specific authorization.  Second, the order authorizes Judge Legge

16   to "preserve any . . . testimony or evidence"; all materials submitted to Judge Legge, as

17   well as the transcript of the hearing before him, have been made part of the record in the

18   instant action.  Third, the order expressly provides that the Court could "adopt Judge

19   Legge's findings or revisit them at the January 19, 2007 hearing," (see Stipulated

20   Appointment Order at 2:22-23), and thus establishes the time limits and procedure by

21   which the Court would review Judge Legge's findings.  Although the order does not

22   expressly set forth the applicable standards for review of Judge Legge's findings, those

23   standards are provided in Rule 53 itself.  Because the parties did not stipulate that Judge

24   Legge's findings of fact would be either "reviewed for clear error" or "final," the Court must

25   review any such findings of fact de novo.  See Fed. R. Civ. P. 53(g)(3).  The Court also

26   must review de novo all findings of law.  See Fed. R. Civ. P. 53(g)(4).  The Court may set

27   aside any ruling on "a procedural matter only for an abuse of discretion."  See Fed. R. Civ.

28   P. 53(g)(5).

Evans further objects that he was not given an opportunity to be heard prior to the Court's appointment of Judge Legge as master.  Rule 53(b)(1) requires a court to "give the parties notice and an opportunity to be heard before appointing a master"; Rule 53(a)(1) permits a court to appoint a master only to "perform duties consented to by the parties."  See Fed. R. Civ. P. 53(a)(1), (b)(1).  Here, plaintiffs and defendants expressly consented to the appointment of Judge Legge.  Evans cites no authority requiring class counsel to obtain the consent of all members of the class prior to agreeing to the appointment of a master.

Finally, Evans notes that Rule 53 permits any party to file objections to a master's findings and that, accordingly, he and the other objectors to the settlement should be permitted to file objections to Judge Legge's findings.  In particular, Rule 53(g)(2) provides that any "party may file objections to – or a motion to adopt or modify – the master's order, report, or recommendations no later than 20 days from the time the master's order, report, or recommendations are served, unless the court sets a different time."  See Fed. R. Civ. P. 53(g)(2).  Assuming, arguendo, the individual class members have such a right separate from class counsel, here, the Court did "set[ ] a different time," by providing that Judge Legge's findings could be "revisit[ed]" at the January 19, 2007 fairness hearing.  To date, no objections to Judge Legge's findings have been filed, and none were raised at the final fairness hearing.

Accordingly, the Court finds Evans's procedural objections to the order appointing Judge Legge provide no basis for rejecting the proposed settlement.

### (2) Objections to Allocation of Settlement Fund

Evans objects that the parties have not provided the Court with "specific information on how the formula for allotting settlement benefits was developed"; in particular, Evans contends, the increased payout for class members who worked in New York, New Jersey, and Pennsylvania appears to be based on speculation.

Subsequent to the date of Evans's objections, the parties filed detailed briefing on this issue with Judge Legge, explaining that although the value of the class overtime claims is fairly consistent throughout all jurisdictions (with the exception of California), the value of

the unlawful deductions claims differs significantly between two groups of states.  In the first group, which defendant describes as the "freedom to contract states" and which include the "vast majority" of the jurisdictions at issue in the instant settlement, courts "typically sustain reimbursement agreements between employers and employees, contracts defining wages, and/or contracts permitting wage deductions."  (See Defendants' memorandum to Judge Legge at 6:23-7:3.)  According to defendants, their liability in "freedom to contract" states is "non-existent or less than its exposure in other states."  (See id. at 7:12-13.)  In the second group, consisting of New York, New Jersey, and Pennsylvania, the law, according to defendants, is not as clear with respect to the propriety of the deductions at issue.  Accordingly, "[t]o account for the parties' greater uncertainty regarding the likely outcome of Class Member's deductions in these three states, [the parties] agreed to allocate a larger portion of the Settlement proceeds to Class Members in New York, New Jersey, and Pennsylvania."  (See id. at 7:25-8:3.)

        Judge Legge, in his January 12, 2007 Report, concluded that the allocation formula is fair, reasonable, and adequate.  Having reviewed de novo the memoranda submitted to Judge Legge, as well as the transcript of the January 4, 2007 hearing before Judge Legge, the Court agrees that the parties have set forth a reasoned basis for treating claimants employed in New York, New Jersey, and Pennsylvania differently from claimants employed in other jurisdictions.

        Accordingly, the Court finds Evans's objections to the allocation formula do not warrant rejection of the settlement.

### v. Separate Settlements in Bowman and Glass

        Evans next argues that the parties have failed to adequately explain why Bowman and Glass were filed as separate actions and, consequently, why California employees are not part of the Glass settlement.  As discussed above, Bowman and Glass were filed at separate times by separate counsel.  Moreover, Bowman was filed and settled prior to the filing of any of the actions that ultimately were consolidated in Glass.

        Accordingly, this objection does not warrant rejection of the instant settlement.

20

1

### vi.  Claims Administration

2          Evans's next objection is that the settlement grants the claims administrator the final

3  word in resolving disputes over claims to the settlement fund.  In particular, the settlement

4  provides that the claims administrator "will perform the duties of . . . notifying the Parties of

5  and resolving any disputes regarding claims by the Class Members."  (See Amended Joint

6  Stipulation of Settlement at 3 ¶ 3.)  Evans contends the settlement should be amended to

7  grant the class members the right to petition the Court in the event of a dispute as to the

8  manner in which a claim is resolved by the claims administrator.

9          The parties, in response, argue that the resolution of claims disputes is not complex,

10  and that Rust Consulting, Inc. ("Rust"), the claims administrator, is an experienced neutral

11  evaluator who is capable of reaching a fair resolution.  Consequently, the parties argue,

12  adding court review to the process "would delay the Settlement for no ascertainable

13  purpose."  (See Motion at 17:12-25.)[8]  Evans has submitted no evidence calling into

14  question Rust's ability to resolve in a fair manner disputes as to claims, and has submitted

15  no authority requiring the Court to resolve any such disputes.

16          Accordingly, this objection does not warrant rejection of the settlement.[9]

17                          ### vii.  Joseph Glass NASD Arbitration

18          Evans's final objection to the settlement is that the parties have provided no

19  information about named plaintiff Joseph Glass's claims in NASD arbitration No. 04-04995.

20  Evans contends such information is "needed to ensure that there is nothing about . . .

21

_____

22          [8] David Holland ("Holland"), Principal Consultant for Rust Consulting, Inc., attests
that as of January 4, 2007, he has received 482 claim forms that dispute the employment
23  history provided to class members on their claim forms.  (See Holland Decl. ¶ 20.)  The
settlement provides that any such disputes shall be resolved by the claims administrator if
24  the parties are unable to reach an agreement as to their resolution.  (See Amended Joint
Stipulation of Settlement ¶ 44.)
25

26          [9] Evans also objects that, although the Settlement provides for a reasonable
payment for the services of the claims administrator, no information about such cost has
27  been provided.  Holland has since attested, in his declaration filed January 4, 2007, that
"[t]he total estimated cost for the administration of this Settlement, including fees incurred
28  and future costs for completion of the administration, is $182,847.90."  (See Holland Decl. ¶
24.)

Glass's NASD claims that would affect his ability to adequately represent the class."  (See Evans Objections at 11:12-17.)  In response, the parties represent that Glass's arbitration "does not encompass any overtime or wage deduction claims and is entirely irrelevant to th[e] Settlement."  (See Joint Motion at 15 n.11.)  At the final fairness hearing, the parties informed the Court that the subject of the NASD arbitration was race and age discrimination.  No evidence has been presented to the contrary.

Accordingly, this objection does not warrant rejection of the settlement.

### g.  Conclusion

For the reasons set forth above, the Court finds the proposed settlement is fair, reasonable, and adequate, and will GRANT the parties' joint motion for approval thereof.

### B.  Motion for Attorneys' Fees, Costs and Class Representative Enhancements

Class counsel moves for an award of fees and costs in the amount of $11,250,000, as well as a $25,000 payment to each of the four named plaintiffs.  As noted, the settlement provides for a maximum payment of "up to $11,250,000.00 in attorney' fees and litigation costs to Class Counsel, subject to Court approval" as well as "a pool of up to $100,000.00 in enhancements to be divided among the Class Representatives, subject to Court approval."  (See Amended Joint Stipulation of Settlement ¶ 29(a).)

### 1.  Fees and Costs

### a.  Legal Standard

"Under the 'common fund' doctrine, 'a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'"  See Staton, 327 F.3d at 967 (quoting Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980)).  "'The doctrine rests on the presumption that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.'"  Id. (quoting Boeing, 444 U.S. at 478).  Under the common fund doctrine, the Court may assess "attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.'"  See id. (quoting Boeing, 444 U.S. at 478).

1    Under the common fund doctrine, the Court may award fees by using either the

2  percentage-of-the fund method or the lodestar method, and "no presumption in favor of

3  either the percentage or the lodestar method encumbers the district court's discretion to

4  choose one or the other."  See In re Washington Public Power Supply System Securities

5  Litigation, 19 F.3d 1291, 1296 (9th Cir. 1994).  "As always, when determining attorneys'

6  fees, the district court should be guided by the fundamental principle that fee awards out of

7  common funds be 'reasonable under the circumstances.'"  Id. (quoting Florida v. Dunne,

8  915 F.2d 542, 545 (9th Cir. 1990) (emphasis in original)).

9    The Ninth Circuit has repeatedly held that 25% of the gross settlement amount is the

10  benchmark for attorneys' fees awarded under the percentage method and that if the Court

11  departs from that benchmark, the record must indicate the Court's reasons for doing so.

12  See, e.g., Powers v. Eichen, 229 F.3d 1249, 1256-57 (9th Cir. 2000).  "The benchmark

13  percentage should be adjusted, or replaced by a lodestar calculation, when special

14  circumstances indicate that the percentage recovery would be either too small or too large

15  in light of the hours devoted to the case or other relevant factors."  See Six Mexican

16  Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990).

17                **b.  Discussion**

18    Class members Cintron and Evans, as well as the New York Attorney General, have

19  filed objections to the amount of attorneys' fees and costs sought by class counsel.  Cintron

20  objects that the amount of attorneys' fees and costs sought "is disproportionate and

21  ridiculous."  (See Cintron Objection at 1.)  The New York Attorney General argues that the

22  fees sought are "unreasonable" in light of "the minimal work required from plaintiffs' counsel

23  and the insignificant risk of non-recovery which they ran," and suggests that, under the

24  circumstances, an award based on the lodestar would be more appropriate.  (See Amicus

25  Curiae Memorandum of New York Attorney General at 15-16.)  Evans contends the Court

26  should conduct a "lodestar cross-check" against class counsel's request for $11,250,000 in

27

28

1   fees and costs.[10]  (See Evans Objection at 12.)

2       The Ninth Circuit has held that the Court may, but is not required to, compare the

3   lodestar and the 25% benchmark to determine if the 25% benchmark results in an

4   inappropriately high or low fee.  See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050-51

5   (9th Cir. 2002) (observing that calculation of lodestar provides check on reasonableness of

6   percentage award; affirming district court's conclusion that fee award of 28% of fund and

7   3.65 times lodestar amount was reasonable); Fischel v. Equitable Life Assurance Society of

8   the United States, 307 F.3d at 1001, 1007 (9th Cir. 2002) (finding no error where district

9   court awarded fees under lodestar method and failed to compare lodestar with 25%

10  benchmark).

11      In the instant action, although class counsel has not provided the Court with

12  information from which the Court could calculate the lodestar, there can be no doubt that

13  the lodestar would result in a fee substantially lower than the $11,250,000 claimed.  The

14  dockets for the three cases that ultimately were consolidated in the Glass action show no

15  litigation activity of substance other than the filing of the complaints.  (See New York

16  Attorney General Decl. E's. 10, 12, 17.)  Additionally, because the instant settlement was

17  reached prior to the filing of the Glass action, in which those three cases were

18  consolidated, there was no litigation in this Court prior to settlement.  Since that time,

19  however, a considerable number of filings on behalf of the plaintiff class have been made

20  and, of course, those filings do not necessarily reflect all the hours spent by class counsel

21  out of court.  Nevertheless, the Court would not expect those out-of-court hours to affect

22  the lodestar to the extent of producing a fee as high as that claimed herein under the

23  percentage method.

24      The early settlement of the instant action resulted in significant benefit to the class,

25  however.  In light of the recent Opinion Letter of the Department of Labor, issued

26  _____

27      [10] Evans's additional objection, that class counsel has not documented the actual
    costs incurred, has been addressed by the declaration of class counsel, filed January 5,
    2007, attesting that class counsel have incurred actual expenses in the total amount of
28  $56,924.07, and providing a summary thereof.  (See McInerney Decl. ¶ 19 and Ex. F.)

24

1   November 27, 2006, defendants likely would not agree to as large a settlement, or, indeed,

2   any settlement, if the parties were attempting to negotiate a settlement today.  Class

3   counsel expressly recognized the negative impact an opinion letter could have on the

4   instant litigation well before the November 27, 2006 Opinion Letter was issued.  (See, e.g.,

5   Plaintiff's Opposition to Lawrence R. Kaufmann's Motion to Intervene, filed Oct. 27, 2006,

6   at 3-4 (noting "[t]he whole idea that stockbrokers can recover for improper wage deductions

7   or sue for overtime is clearly a novel one . . . [and] a new opinion letter could end this genre

8   as quickly as it did a few years ago when the Department of Labor wrote that insurance

9   adjusters were exempt from overtime").)  Class counsel achieved an excellent result for the

10   class members by settling the instant action promptly.

11        Although the Ninth Circuit has noted that where an action is settled quickly after the

12   action is filed, "the lodestar calculation may convince a court that a lower percentage [than

13   the 25% benchmark] is reasonable," it also has explained that it did "not mean to imply that

14   class counsel should necessarily receive a lesser fee for settling a case quickly."  See

15   Vizcaino, 290 F.3d at 1050 and n.5.  Indeed, as the Ninth Circuit has observed, "it is widely

16   recognized that the lodestar method creates incentives for counsel to expend more hours

17   than may be necessary on litigating a case so as to recover a reasonable fee, since the

18   lodestar method does not reward early settlement."  See id. at 1050 n.5.

19        Moreover, the Ninth Circuit has held the "relevant circumstances" that could justify

20   an upward departure from the 25 percent benchmark include the achievement of

21   "exceptional results" for the class.  See Vizcaino, 290 F.3d at 1048 (affirming fee award of

22   28 percent of settlement fund).  Under the circumstances presented here, where the early

23   settlement resulted in a significant benefit to the class, the Court finds no need to conduct a

24   lodestar cross-check.[11]  Class counsel's prompt action in negotiating a settlement while the

25   state of the law remained uncertain should be fully rewarded.

26   _____

27        [11] Consequently, the Court also rejects Evans's argument that because the class
     notice states defendants will not challenge the amount of fees sought by class counsel,
28   (see Class Notice at 5 ¶ J), the Court must permit Evans to review class counsel's time
     records.

1    The New York Attorney General and Evans further argue that even if fees are

2 awarded under the percentage method, the Court should base such fees on the amount of

3 the settlement fund actually claimed by the class.  The Ninth Circuit has held, however, that

4 the district court must award fees as a percentage of the entire fund, or pursuant to the

5 lodestar method, not on the basis of the amount of the fund actually claimed by the class.

6 See Williams v. MGM-Pathe Communications Co., 129 F.3d 1026, 1027 (9th Cir. 1997).

7 Contrary to Evans' argument, the Court finds inapplicable the Class Action Fairness Act's

8 provision that "any attorney's fee award to class counsel that is attributable to the award of

9 . . . coupons shall be based on the value to class members of the coupons that are

10 redeemed."  See 28 U.S.C. § 1712(a).  That statute, on its face, does not apply to non-

11 coupon settlements.

12    Accordingly, the Court finds the benchmark of 25% of the settlement is reasonable

13 under the circumstances presented herein.

14    **2.  Enhancements**

15    Class counsel requests that the Court award a $25,000 enhancement to each of the

16 four class representatives for their assistance in the instant litigation.  As noted, the

17 settlement provides for "a pool of up to $100,000.00 in enhancements to be divided among

18 the Class Representatives, subject to Court approval."  (See Amended Joint Stipulation of

19 Settlement ¶ 29(a).)

20    Evans objects to payment of such enhancements, relying on a statement in the

21 Committee Report on the Private Securities Litigation Act of 1995 ("PSLRA") that "lead

22 plaintiffs are not entitled to a bounty for their service."  (See id.; see also 15 U.S.C. § 78u-

23 4(a)(4) ("The share of any final judgment or of any settlement that is awarded to a

24 representative party serving on behalf of a class shall be equal, on a per share basis, to the

25 portion of the final judgment or settlement awarded to all other members of the class.").)

26 The instant action is not an action brought pursuant to the PSLRA, however, and,

27 consequently, is not subject to the PSLRA's ban on enhancements to lead plaintiffs.

28 Where the PSLRA does not apply, the issue of "[w]hether to award [a lead plaintiff] for his

1   efforts is within the Court's discretion."  See Van Vranken v. Atlantic Richfield Co., 901 F.

2   Supp. 294 (N.D. Cal. 1995).

3          Evans further objects that the payments sought are "excessive" and that such

4   payments "should be based on declarations filed by each proposed recipient, describing

5   the services he performed on behalf of the class."  (See Evans Objection at 21.)  Class

6   counsel has filed a declaration attesting that the named plaintiffs "provided a great deal of

7   informal discovery to Class Counsel and a great deal of insight into the policies and

8   practices of UBS," (see McInerney Decl. ¶ 20), and provided additional relevant detail at

9   the final fairness hearing.  Class counsel further attests that "these four individuals, all of

10  whom are still currently employed in the securities industry, placed something at risk by

11  putting their names on a complaint against one of the largest brokerage houses in

12  America."  (See id.)  The Court finds such representations, although not as detailed a

13  showing as Evans asserts is necessary, are sufficient to support approval of the requested

14  enhancements.

15         Accordingly, the Court finds the requested payment of $25,000 to each of the named

16  plaintiffs is appropriate.

### CONCLUSION

18         For the reasons set forth above,

19         1.  The parties' joint motion for final approval of settlement is hereby GRANTED.

20         2.  Class counsel's application for attorney's fees, costs, and class representative

21  enhancements is hereby GRANTED.

22         **IT IS SO ORDERED.**

23  Dated: January 26, 2007

_____
MAXINE M. CHESNEY
United States District Judge

27